## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

MSP CORPORATION, a
Minnesota corporation,

        Plaintiff,

v.

        **PRELIMINARY INJUNCTION**
        Civil File No. 07-2301 (MJD/SRN)

WESTECH INSTRUMENTS, INC.,
a Georgia corporation; WESTECH
INSTRUMENT SERVICES, LTD., a
United Kingdom corporation; and
WESTECH INSTRUMENT HOLDINGS,
PLC, a United Kingdom corporation;

        Defendants.

_____

Craig S. Coleman, Elizabeth Cowan Wright, Felicia J. Boyd, and William L. Roberts, Faegre & Benson, LLP, Counsel for Plaintiff.

Bruce H. Little, Christopher R. Smith, Lindquist & Vennum PLLP; Damon J. Whitaker and Ryan T. Pumpian, Powell Goldstein, LLP; Counsel for Defendants.

_____

## I.    INTRODUCTION

    This matter is before the Court on Plaintiff MSP Corporation's Motion for

Preliminary Injunction.  [Docket No. 6]  The Court heard oral argument on July

27, 2007.

## II.    BACKGROUND

### A.    Factual Background

### 1.    Parties

Plaintiff MSP Corporation ("MSP") is a Minnesota corporation located in Shoreview, Minnesota, with 40 employees.  It sells products internationally that are used in the semiconductor, pollution control, and pharmaceutical industries.

Defendants Westech Instruments, Inc., a Georgia corporation; Westech Instrument Services Ltd., a United Kingdom corporation; and Westech Instrument Holdings, PLC, a United Kingdom corporation, (collectively "Westech") market and manufacture aerosol testing devices, including impactors.  Defendant Westech Instruments, Inc., is the United States distributor for Westech products.

Westech promotes its products in the United States and Minnesota through the internet and also markets directly to Minnesota residents through direct email advertisements.

### 2.    Impactor Product and Development of the Next Generation Impactor

Certain inhaled medications are dispensed through aerosol or powder inhalers.  In order to create metered-dose and dry-powder inhalers, pharmaceutical companies must measure the quantity and particle size of the medication dispensed in each dose.  An impactor is a device that measures the size of aerosol particles and is used by pharmaceutical companies to test inhalers.

Until the end of the 1990s, pharmaceutical companies used impactor technology that was developed for military applications in the 1940s.  This

2

impactor was called the Andersen Impactor or the Andersen Cascade Impactor ("ACI") and was not precise.  The Andersen Impactor functioned by forcing the aerosol or powder through a series of stages or "cascades" designed to sort particles.

Due to the accuracy problems of the Andersen Impactor, a consortium of 15 pharmaceutical companies, called the Next Generation Impactor Consortium ("the Consortium") was founded to fund research and development of a new impactor. The Consortium selected MSP to develop the new impactor.  In 1998, MSP entered into a written contract with Consortium representative Glaxo-Wellcome Research and Development Limited ("Glaxo") to develop the new impactor ("Glaxo Contract").

### 3.    Glaxo Contract

Under the Glaxo Contract, the Consortium paid MSP $950,000.  The Glaxo Contract also required that the new impactor design, called the Next Generation Impactor or "NGI," be published in peer-reviewed journals and/or the Pharmacopoeia, including the specific design requirements and full dimension drawings.  The Glaxo Contract also required MSP to use "its best commercial efforts to reduce the manufacturing cost and final price" of the NGI.

The Glaxo Contract requires MSP, after having sold its first 100 units, "to make available all INTELLECTUAL PROPERTY resulting from [the Glaxo

Contract] . . . necessary for the manufacture of NGIs or further embodiments of

the NGI for use or sale only in the pharmaceutical industry . . .[and] to license

upon reasonable terms and conditions [to] third parties reasonably able to

manufacture NGIs to provide additional source(s) of NGIs for the

[pharmaceutical] industry." MSP's licensing obligation extends to all patents,

copyrights, and designs that may cover NGIs and survives termination of the NGI

Contract.

### 4.   The Next Generation Impactor

In 2000, MSP introduced a prototype new impactor called the Next

Generation Impactor ("NGI"). The NGI improved the reliability, accuracy, and

efficiency of particle measurement. While the Andersen Impactor had a vertical

cylindrical design, MSP set the cascade stages in a flat horizontal design. MSP

created a puzzle-piece shape for the NGI that traces the shape of the internal

components of the NGI, but MSP avers that design could have been a rectangle or

square, and the puzzle shape had no impact on the device's performance. It also

made the bottom of the outside of the NGI royal blue, to match MSP's company

colors and logo.

After extensive testing, the Consortium approved MSP's second prototype,

the NGI, as a standard-setting measurement device, and the FDA accepts

measurements taken by the NGI device as accurate and reliable. Almost all new

impactors purchased by pharmaceutical companies are MSP's NGI device, and MSP has sold more than 400 NGI devices.

There are a number of other types of impactors on the market, as well, such as the ACI, the Marple-Miller Impactor, and the Multi-Stage Liquid Impinger. Several manufacturers make and sell their own versions of these different impactors. For example, Westech and Copley Scientific ("Copley") both make and sell the Andersen Cascade Impactor. Those in the pharmaceutical industry are aware that multiple companies make and sell the same type of impactor.

According to Westech, the weight of the impactor is an important feature and some customers are willing to pay more for a lighter titanium device, such as the versions of Andersen Cascade Impactors sold by Westech and Copley. Also according to Westech, impactor consumers are usually well-educated persons working at sophisticated pharmaceutical companies.

### 5.    MSP's Treatment of Its Intellectual Property

MSP had authority under the Glaxo Contract to seek protection for any intellectual property; however, MSP did not seek trademark or trade dress protection for any of the marks relevant in this lawsuit. Additionally, MSP does not use the common law trademark designation (TM) with any of the marks at issue in this case, although it uses the TM designation with other products that it offers.

### 6.    Westech's Competing Product

#### a.    Westech's Product

Westech asserts that it created its own NGI with the support of Pfizer Global R&D Ltd. ("Pfizer"), an original Consortium member.  Westech modeled its device from the NGI specifications approved by the NGI Consortium and disclosed in the European Pharmacopoeia ("EP").  The United States Pharmacopoeia ("USP") and EP are the official texts containing the standards for all prescription and over-the-counter medicines, dietary supplements, and other healthcare products and devices manufactured and sold in Europe and the United States.  The specifications included the dimensions of the preseparator, the nozzle diameters of the jet stages, the micro-orifice collector, the cup depth, the collection cup surface roughness, and the nozzle to seal body distances.  Westech also matched the shape of the housing to the shape of the jet stages and the interstage flow channels, in part, it claims, to reduce the weight of the device.

#### b.    Westech's Interaction with MSP

On January 9, 2007, Westech requested a meeting with MSP to discuss issues before Westech made a formal request to MSP to license the manufacture of the NGI.  Westech Chief Executive Officer, Mike Smurthwaite, and another Westech employees met with MSP officials in Minnesota on January 24, 2007.  According to Westech, the parties discussed Westech becoming a licensed NGI

manufacturer and came to a number of agreements regarding the steps to take toward such a licensing arrangement.  According to MSP, the parties did not come to any agreement regarding a potential licensing agreement.

On February 13, 2007, Westech informed MSP of its intention to manufacture NGIs for international sale and to display a Westech-manufactured NGI at RDD Europe in April 2007.  Westech requested that MSP clarify its position and suggest how the parties could move forward.  MSP responded that it understood Westech's statements and stated it would discuss the matter internally in order to come up with a response.

Westech proceeded to display its NGI prototype at the trade show and advertise on the internet.  The prototype was almost identical to MSP's NGI in shape and color.

### c.    Westech's Advertising

Westech refers to its product as "our new NGI," "Westech Next Generation Impactor," and "Westech 7-Stage Impactor with Micro-Orifice Collector."  Since this lawsuit was filed, Westech has now changed the color of its impactor from blue to green and has eliminated references to "Next Generation" on its website.

### B.    Procedural Background

On May 14, 2007, MSP filed a Complaint against Westech alleging Count One: Violation of Lanham Act for False and Misleading Statements; Count Two:

Violation of Lanham Act for Infringement of the Royal Blue Mark; Count Three:

Violation of Lanham Act for Infringement of the Puzzle-Piece Mark; Count Four:

Violation of Lanham Act for Infringement of the NGI Mark; Count Five: Violation

of Lanham Act for Infringement of MSP's Trade Dress; Count Six: Deceptive Trade

Practices Under Minn. Stat. § 325D.44; Count Seven: Minnesota Common Law

Trademark Infringement (Royal Blue Mark); Count Eight: Minnesota Common

Law Trademark Infringement (Puzzle-Piece Mark); Count Nine: Minnesota

Common Law Trademark Infringement (NGI Mark); and Count Ten: Minnesota

Common Law Trade Dress Infringement.

MSP then filed this Motion for Preliminary Injunction against all

Defendants.

**III.    DISCUSSION**

**A.    Evidentiary Objections**

Both sides object to the affidavit evidence submitted by the other side,

claiming that certain portions are hearsay, speculative, or irrelevant.  The Court

has examined all objections and affidavits and concludes that overall, the

objections go to the weight, not the admissibility, of the evidence.  As to Westech's

specific objections regarding MSP's Lanz and Roberts affidavits purporting to

report statements of confusion by anonymous consumers, the Court concludes

that those statements do not demonstrate consumer confusion.  Even if

8

admissible, these vague statement, without even identifying the speakers, are not reliable evidence of customer confusion.

### B.     Preliminary Injunction Standard

The Eighth Circuit Court of Appeals has established the standard for considering preliminary injunctions and temporary restraining orders.  Dataphase Sys. Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  This Court must consider (1) the threat of irreparable harm to the moving party if an injunction is not granted, (2) the harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted, (3) the public interest, and (4) the probability that the moving party will succeed on the merits.  Id.

"[A] preliminary injunction motion is too early a stage of the proceedings to woodenly assess a movant's probability of success on the merits with mathematical precision."  Gen. Mills, Inc. v. Kellogg Co., 824 F.2d 622, 624 (8th Cir. 1987). "[W]here the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation."  Dataphase Sys., Inc., 640 F.2d at 113.

### B.     Likelihood of Success on the Merits

MSP asserts that it is likely to succeed on the following claims:

### 1. Lanham Act, 15 U.S.C. § 1125(a)

MSP asserts that Westech has violated the Lanham Act by infringing MSP's trademarks in the NGI and Next Generation Impactor names, as well as the design of the device; infringing MSP's distinctive trade dress for the NGI device; and falsely promoting Westech's device as a device approved by the Consortium.

Under the Lanham Act,

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

In order to show trademark infringement under the Lanham Act, MSP must show that it has a mark entitled to protection and that Westech's use of the mark is likely to confuse consumers as to the source of Westech's product or services. 15 U.S.C. § 1125(a); Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C., 393 F.3d

755, 759 (8th Cir. 2005).  When none of the marks at issue have been federally registered, the plaintiff "bears the burden of establishing that its marks are protectible under trademark law."  Frosty Treats Inc. v. Sony Computer Entm't Am. Inc., 426 F.3d 1001, 1003 (8th Cir. 2005).

### a.    Trademark Infringement

#### i.    Whether MSP Possesses Valid Trademarks in "NGI" and "Next Generation"

##### aa.    Standard

In order for MSP to possess valid trademarks it must prove that it used the mark in actual commerce to identify goods, was the first to do so, and the mark was valid.  Frosty Treats Inc. v. Sony Computer Entm't Am. Inc., 426 F.3d 1001, 1003 (8th Cir. 2005); Aveda Corp. v. Evita Mktg., Inc., 706 F. Supp. 1419, 1427 (D. Minn. 1989).

The parties do not dispute that MSP used the NGI and Next Generation marks first and in actual commerce to identify goods.  They disagree regarding whether the mark is valid.

> A term for which trademark protection is claimed will fall in one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful.  A generic mark refers to the common name or nature of an article, and is therefore not entitled to trademark protection.  A term is descriptive if it conveys an immediate idea of the ingredients, qualities or characteristics of the goods, and is protectible only if shown to have acquired a secondary meaning.  Suggestive marks, which require imagination, thought, and perception to reach a conclusion as to the nature of the goods, and

11

> arbitrary or fanciful marks, are entitled to protection regardless of
> whether they have acquired secondary meaning.

Frosty Treats Inc., 426 F.3d at 1004-05 (citations omitted).

> If a mark is descriptive, the plaintiff
>
> must demonstrate that the mark has acquired a secondary meaning.
> Secondary meaning is an association formed in the minds of
> consumers between the mark and the source or origin of the product.
> To establish secondary meaning, [the plaintiff] must show that [the
> mark] serves to identify its goods and distinguish them from those of
> others.  Secondary meaning does not require the consumer to
> identify a source by name but does require that the public recognize
> the mark and associate it with a single source.

Id. at 1005 (citations omitted).

> Although direct evidence such as consumer testimony or surveys are
> most probative of secondary meaning, it can also be proven by
> circumstantial evidence.  Circumstantial evidence such as the
> exclusivity, length and manner of use of the mark; the amount and
> manner of advertising; the amount of sales and number of customers;
> the plaintiff's established place in the market; and the existence of
> intentional copying could also establish secondary meaning.

Id. at 1005-06 (citations omitted).

MSP asserts that it possesses valid trademarks in the "NGI" and "Next

Generation" names.  It also asserts trade dress rights in the royal blue color of the

bottom of the NGI and in the shape of the NGI.  The shape and color claims are

addressed separately.

      **bb.**    **Whether Next Generation and NGI Are
Generic or Descriptive Marks**

Westech claims that "NGI" and "Next Generation" are generic terms that

identify a class of product.  "A generic term is the name of a particular type, kind, genus or class of goods in which an individual article or service is but a member." Cellular Sales, Inc. v. Mackay, 942 F.2d 483, 485-86 (8th Cir. 1991) (citation omitted).

Westech asserts that the Glaxo Contract repeatedly uses the terms "NGI" and "Next Generation Impactor" to generically refer to the new type of impactor to be developed.  However, the Court does not consider this fact relevant because "[t]he genericness inquiry is concerned with the common use of language,  not the defined terms in a negotiated contract between the trademark holder and a third party."  Colt Defense LLC v. Bushmaster Firearms, Inc., 486 F.3d 701, 709 (1st Cir. 2007) (footnote and citation omitted).

Westech also claims that MSP itself uses the terms "NGI" and "next generation impactor" generically or descriptively in its own advertisements.  For example, in June 2007, MSP stated, "So for all your inhaler testing and development requirements, use MSP's Next Generation Pharmaceutical Impactor (NGI) and you will be ahead."  Westech argues that if "Next Generation" and "NGI" are source identifiers for MSP, then it would be redundant to identify them as "MSP's" product.  The Court does not find this argument persuasive.  In fact, the opposite interpretation of this sentence appears more logical – MSP uses its own name with the marks to further strengthen consumers' association of MSP

with the protected source identifiers, as when Nissan uses the term "Nissan Altima."

There is little other evidence regarding general use of the terms. However, the Court notes, in MSP's favor, that the USP describes the impactor generically as Apparatus Number 5 and notes that is available as the "Next Generation Pharmaceutical Impactor" sold by MSP.

Westech also notes that MSP has not sought protection for the marks by filing trademark registrations for the terms NGI or Next Generation; nor did MSP use the common law "TM" designation in conjunction with the alleged marks. This fact is already considered in the Court's analysis because MSP bears the burden of showing that the unregistered marks are entitled to protection. However, this fact is insufficient to show that the terms are generic. See Two Pesos, Inc., v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992) (noting that designation is not required for possession of valid trademarks).

The Court concludes that MSP is likely to succeed in showing that "NGI" and "Next Generation" are not generic. "Next Generation" does not describe an impactor; nor does it convey any information about the impactor's characteristics, design, or qualities, other than, possibly, that it is a new design. Similarly, the acronym "NGI" does not obviously describe anything at all. See, e.g., Anheuser-Busch Inc. v. Stroh Brewery Co., 750 F.2d 631, 635-36 (8th Cir. 1984)

(noting that an acronym is suggestive if "some operation of the imagination is necessary to equate the initials with the product").

The terms at issue bear some relationship to the product in that the device is the newest type, or next generation, of impactor available. However, the terms do not literally describe the product and require imagination connect them to the impactor. There is no relevant evidence of the terms' generic use. The Court concludes MSP is likely to prove that the terms are suggestive. Thus, proof of secondary meaning is not required.

### ii.    Likelihood of Confusion

### aa.    Standard

When evaluating the likelihood of confusion, the Court examines the following factors:

> 1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's and defendant's marks; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers, and 6) evidence of actual confusion.

Davis v. Walt Disney Co., 430 F.3d 901, 903 (8th Cir. 2005) (citations omitted).

### bb.    Strength of MSP's Mark

The NGI and Next Generation names have been used exclusively since MSP introduced its impactor in 2000, and all MSP NGI devices have been sold with these marks. MSP argues that because its NGI device revolutionized impactor

15

technology and is unique in the industry, MSP's marks are inextricably linked with

MSP.  MSP claims that it has extensively advertised and promoted the distinctive

NGI device since the product was introduced to the market.  MSP also asserts that

its NGI has been well-received and is recognized by its customers.  See Insty*Bit,

Inc. v. Poly-Tech Indus., Inc., 95 F.3d 663, 670 (8th Cir. 1996) (holding that

plaintiff had demonstrated strength of its trade dress through evidence that its

products had received favorable reviews and that over thirty-eight percent of

consumers were familiar with it).

MSP has shown that it has used the marks for seven years with its product.

However, there is no strong evidence of consumer recognition of its mark, only

vague affidavit statements by persons associated with MSP that the marks are

recognized.  This factor weighs slightly in favor of MSP.

### cc.    Similarity of the Marks

Westech's marks are more than similar to MSP's marks: they are identical.

Westech has used the NGI and Next Generation names in its advertisements,

combined with the same shape and shade of blue with chrome in the same color

layout as MSP's NGI.  This factor weighs heavily in favor of MSP because Westech

uses NGI and Next Generation, terms identical to Westech's claimed marks.

### dd.    Degree of Competition

Westech's impactor directly competes with MSP's NGI device for the same

consumers.  MSP also notes that most NGI devices are sold by distributors so customers often have no direct contact with MSP.  In the past, Westech itself distributed other MSP products.  Thus, MSP claims, a consumer could easily purchase a Westech impactor and mistakenly believe that it is purchasing a MSP NGI from an authorized distributor.  See Sun-Fun Prods., Inc. v. Suntan Research & Dev. Inc., 656 F.2d 186, 191 (5th Cir. 1981) (finding past supplier-distributor relationship between competitors to be probative evidence of likelihood of confusion).  This factor weighs heavily in favor of MSP because Westech's product is identical to MSP's, so they are in direct competition.

### ee.    Westech's Intent

MSP argues that Westech's wholesale misappropriation of NGI's name, shape, and color scheme warrants an inference that Westech intended to mislead consumers.  MSP further argues that wrongful intent can be inferred from Westech's prior role as an MSP distributor, Westech's "underhanded" attempt to obtain MSP's approval for its imitation, and Westech's false claims that the Consortium approved its impactor.  See Insty*Bit, Inc. v. Poly-Tech Indus., Inc., 95 F.3d 663, 671 (8th Cir. 1996) (holding that evidence of parties' prior relationship "provides evidence of the alleged infringer's intent to trade on the plaintiff's goodwill") (citation omitted).

Westech asserts it had no intent to pass off its NGI as that of MSP.  Instead,

17

it intends to offer an additional source of NGIs as expressly contemplated by the Glaxo Contract.  Furthermore, it argues that there is no intent to infringe when the defendant clearly represents to the ultimate consumer that it is the manufacturer.  <u>Children's Factory, Inc. v. Benee's Toys, Inc.</u>, 160 F.3d 489, 495 (8th Cir. 1998).  Here, Westech identifies itself as the manufacturer of its NGI by advertising its product as "Westech's NGI" and the "Westech Next Generation Impactor."  It claims no Westech NGI will be sold without being clearly marked as a Westech product.

This factor does not weigh strongly in favor of either party.  Because Westech has not yet sold its product, its averment that all products will be clearly marked is unrefuted and its advertisements do state "Westech."  On the other hand, in light of Westech's past relationship distributing MSP products, such designation may be insufficient.  The Court views with suspicion the fact that Westech went ahead with advertising a product that is almost identical to MSP's and bears the identical name before securing a licensing agreement from MSP.

### ff.    Degree of Consumer Care

"As a general rule, the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases."  <u>Mars Musical Adventures, Inc. v. Mars, Inc.</u>, 159 F. Supp. 2d 1146, 1153 (D. Minn. 2001) (citations omitted).  NGIs

are expensive products, costing thousands of dollars each.  The consumers are

pharmaceutical companies who buy the goods for very sophisticated institutional

purposes and the people who use them are highly trained and intimately familiar

with the product they want to use.  Additionally, it is established industry custom

for several different companies to manufacture and sell different versions of the

same class of impactors; for example, both Westech and Copley sell their own

versions of the Anderson Cascade Impactors.

This factor weighs in favor of Westech because the consumers are

sophisticated and the impactors are only sold to pharmaceutical companies for a

very specific testing purpose and cost thousands of dollars.

### gg.    Evidence of Actual Confusion

Evidence of actual confusion is not necessary to support an injunction.

Advantus Capital Mgmt., Inc. v. Aetna, Inc., No. 06-CV-2855 (JMR/FLN), 2006

WL 2916840, at *5 (D. Minn. Oct. 11, 2006) (unpublished) ("The test for

infringement lies in the likelihood of confusion, not actual confusion; therefore,

plaintiffs are not required to prove any instances of actual confusion.  The absence

of demonstrated confusion, especially when plaintiff has prudently attempted to

forestall it, does not weigh for or against either party on the issue of confusion.")

(citation omitted).  As already noted, MSP's purported evidence that consumers

have already questioned whether Westech is selling the real NGI device as an

authorized distributor is weak because it is based on vague hearsay with little foundation.

This factor weighs in favor of Westech; however, that fact is not dispositive at the preliminary injunction stage, particularly when the defendant has not yet sold any of its product.

Overall, although it is a close question, after weighing all of the factors, the Court concludes that MSP has demonstrated a likelihood of success of showing a likelihood of confusion.  Because MSP has demonstrated a likelihood of success of the merits of both prongs of the trademark infringement test, the Court concludes MSP is likely to succeed on its trademark infringement claim.

### b.    Trade Dress Infringement

MSP claims trade dress and trademark infringement in the royal blue color of the bottom of its impactor and the puzzle-piece shape of its impactor.

### i.    Validity

### aa.    Standard

With respect to colors, "no mark can ever be inherently distinctive." Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 211 (2000).  Thus, a color can only be protected as a trademark if the holder shows secondary meaning.  Id. at 212.  Similarly, "design, like color, is not inherently distinctive." Id.  "[I]n an action for infringement of unregistered trade dress under § 43(a) of

the Lanham Act, a product's design is distinctive, and therefore protectible, only

upon a showing of secondary meaning." Id. at 216.

MSP asserts that its trade dress is inherently distinctive because the shape

and color of the impactor are product packaging, not product design.  The Court

rejects MSP's argument.  In Wal-Mart, the Supreme Court admonished:

> To the extent there are close cases, we believe that courts should err
> on the side of caution and classify ambiguous trade dress as product
> design, thereby requiring secondary meaning.  The very closeness
> will suggest the existence of relatively small utility in adopting an
> inherent-distinctiveness principle, and relatively great consumer
> benefit in requiring a demonstration of secondary meaning.

Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 215 (2000).

The housing of the impactor is part of the product itself, not mere

packaging.  The exterior of the NGI, even if artistic and non-functional, is part of

the product design.  See id. at 213 (identifying a "cocktail shaker shaped like a

penguin" as product design).  And, to the extent that the question is a close one,

the Supreme Court has explicitly urged courts to require secondary meaning.  The

Court concludes that, in order to prevail on its trade dress claims, MSP must prove

secondary meaning.

### bb.    Secondary Meaning

#### i.    Introduction

It is well settled that secondary meaning, or acquired distinctiveness,
requires that the user of . . . a [trade] dress . . . show that by long and
exclusive use in the sale of the user's goods, the [dress] has become

> so associated in the public mind with such goods that the [dress]
> serves to identify the source of the goods and to distinguish them
> from those of others.  [T]he ultimate inquiry is whether in the
> consumer's mind the mark denotes a single thing coming from a
> single source.  That single source, however, need not be known by
> name by consumers.

Stuart Hall Co., Inc. v. Ampad Corp., 51 F.3d 780, 789 (8th Cir. 1995) (citations

omitted) (brackets in original).  When determining secondary meaning, the Court

examines such factors as "consumer surveys, deliberate copying of the mark,

advertising featuring the trade dress at issue, expenditure on such advertising,

and anecdotal evidence showing consumer identification of the trade dress with

its source."  Id. (citation omitted).

MSP asserts that the NGI's appearance has acquired secondary meaning.  It

also asserts that Westech's copying is strong evidence of secondary meaning.  MSP

also argues that it has used its marks and appearance since it introduced the

device seven years ago.  It has advertised its impactor with the relevant marks.

Finally, it claims it has evidence of actual consumer confusion because consumers

assumed that MSP authorized Westech to manufacture or distribute an impactor

that is a twin of MSP's.

### ii.    Shape

MSP asserts that the shape of its device is not functional.  Because MSP's

trade dress is not registered, MSP has the burden of proving that the dress is

nonfunctional.  Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 869 (8th Cir.

1994).  A product feature is functional "if it is essential to the use or purpose of

the article or if it affects the cost or quality of the article, that is, if exclusive use of

the feature would put competitors at a significant non-reputation-related

disadvantage."  Qualitex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 165 (1995)

(citation omitted).  "The Lanham Act, furthermore, does not protect trade dress in

a functional design simply because an investment has been made to encourage

the public to associate a particular functional feature with a single manufacturer

or seller."  TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 34-35 (2001).

Westech claims that the puzzle-piece shape of the NGI is functional because

it lowers the weight of the device.  Westech asserts that consumers desire

decreased impactor weight, which is why Westech and Copley both offer the

Andersen Impactor in titanium, which is 40% lighter in weight.  It argues that

reducing weight clearly is functional, when some courts have held that the color

black can be functional simply because it makes products appear smaller.

Brunswick Corp. v. British Seagull Ltd., 35 F.3d 1527, 1531-32 (Fed. Cir. 1994).  It

notes that patent law, not trademark law, rewards manufacturers for their

innovation in creating a particular device.  TrafFix, 532 U.S. at 34.

MSP asserts that the external shape of its device serves no utilitarian

purpose.  Also, it argues that Westech could have chosen any number of external

shapes to lower the weight of the device in its advertisements.  MSP notes that

Westech never mentions the weight of its NGI device, belying its argument that the puzzle shape was chosen because customers prefer a lighter device.  MSP asserts that, unlike Andersen Impactors, users lift only the removable trays in the MSP impactor, while the housing remains stationary.  Thus, Westech's reference to the importance of weight for the Andersen Impactor design is not relevant.

The Court concludes that the weight of the shape of the NGI does not make the shape functional.  The evidence before the Court does not show that the puzzle-piece shape materially lowers the impactor's weight or that Westech used the shape in order to lower that weight.

Westech also notes that the product design follows the specifications of the EP and the USP with the puzzle-piece shape doing nothing more than tracing the required elements.  It concludes that it cannot be more expensive to manufacture a puzzle-piece shaped impactor than a rectangular impactor because the Glaxo Contract required MSP to use its "best commercial efforts to reduce the manufacturing cost and final price" of the NGI.

Westech claims that it copied MSP's product in order to comply with the specifications required by the EP and USP, which was what the Consortium intended when in contracted with MSP and funded the development of the product class prototype and required MSP to license all of its intellectual property related to the NGI.  MSP admits that there is a high demand for NGIs.  Westech

asserts that it copied the demanded product in order to provide another species of NGIs as the Consortium intended.  It argues that consumers expect an impactor that functions like the NGI to have the puzzle-piece appearance.

The Court concludes that MSP is not likely to show secondary meaning for the puzzle-piece shape of the impactor.  Westech's argument that the shape is functional in that it reduces weight, is weak; however, MSP has provided no evidence that it highlighted the shape in its advertisements or how much it spent on advertising, and there is no evidence that consumers associate the shape with one source.  Additionally, there is evidence that, in this industry, consumers expect products to come from multiple sources but have the same shape, as in the case of the Andersen Cascade Impactor.  Significantly, Westech has represented that its logo and name will appear prominently on all Westech puzzle-piece shaped impactors.  The Court directs Westech that it must, in fact, place its name on all such products.[1]  Overall, evidence of secondary meaning too weak for the Court find a likelihood of success on the merits.  Because MSP has not shown secondary meaning, the Court does not reach the likelihood of consumer confusion analysis.

### iii.    Color

---

[1]The Court also strongly suggests that MSP ensure that its own name and/or logo is prominently displaced on its NGI.

Secondary meaning for a color is established when the plaintiff extensively and continuously used the color for a significant period of time and spent a substantial amount on advertising that highlighted the color.  For example, the Federal Circuit held that the plaintiff had established secondary meaning for the color pink for its fiberglass because it had exclusively and continuously used pink for insulation for over 25 years and had spent $42 million on advertising in nine years on ads that specifically highlighted the color pink.  In re Owens-Corning Fiberglass Corp., 774 F.2d 1116, 1125 (Fed. Cir. 1985).  The plaintiff emphasized the color pink by using the Pink Panther, the color pink, and phrases such as "Put your house in the pink."  Id. at 1126.  The plaintiff also submitted survey evidence.  Altogether, this evidence established secondary meaning.  Id. at 1128.

In this case, MSP makes little effort to establish secondary meaning.  Instead, it relies on unsubstantiated assertion of its employee, consultant, and distributor that consumers associate the alleged marks with MSP and that MSP substantially advertises the alleged marks.  MSP has provided no evidence of the scope of its advertising or the effects those efforts have had on relevant consumers.  Moreover, the marketing materials that MSP does provide do not highlight the claimed color.

While secondary meaning can be inferred from evidence of deliberate copying, courts will not infer secondary meaning when the defendant

conspicuously uses its own trademark to identify the product.  Aromatique, Inc. v.

Gold Seal, Inc., 28 F.3d 863, 871 (8th Cir. 1994).  Here, Westech has provided

evidence that it intends to conspicuously display its own mark on its NGI and has

identified itself as the manufacturer of its NGI.  Moreover, the evidence currently

before the Court is that Westech no longer advertises its impactor, or intends to

sell its impactor, with the royal blue color.

The Court concludes that MSP is not likely to show secondary meaning for

the color royal blue.  There is no evidence that MSP highlights the color in ads,

and there is no evidence consumers associate the color with a single source.

Overall, evidence of secondary meaning too weak for the Court find a likelihood

of success on the merits.  Because MSP has not shown secondary meaning, the

Court does not reach the likelihood of consumer confusion analysis.

### c.    False Advertising

### i.    Standard

Under the Lanham Act, '[a]ny person who, . . . in connection
with any . . . services, . . . uses in commerce any . . . false or
misleading representation of fact, which . . . in commercial
advertising or promotion, misrepresents the nature, characteristics,
[or] qualities . . . [of] another person's . . . services . . . shall be liable .
. . by any person who believes . . . to be damaged by such act.'  15
U.S.C. § 1125(a)(1)(B).  The purpose of this Act is to protect persons
engaged in commerce against false advertising and unfair
competition.

To establish a claim for false advertising, [MSP] must establish
the following: 1) [Westech] made false statements of fact about its

own product; 2) [Westech]'s statement actually deceived or had the
tendency to deceive a substantial segment of its audience; 3) the
deception created was material; 4) [Westech] caused the false
statement to enter interstate commerce; and 5) [MSP] has been or is
likely to be injured as a result of [Westech]'s alleged false
advertisement.  Failure to establish any one element of the prima
facie case is fatal to the claim.  Under the first element, a statement is
false if it is either 1) literally false, or 2) literally true or ambiguous,
but renders a false impression when viewed in context.  A literally
false statement can be determined as a matter of law, but whether a
statement is misleading is considered a matter of fact.

Allsup, Inc. v. Advantage 2000 Consultants Inc., 428 F.3d 1135, 1138 (8th Cir.

2005) (brackets in original) (citations omitted).  "If a plaintiff proves that a

challenged claim is literally false, a court may grant relief without considering

whether the buying public was actually misled; actual consumer confusion need

not be proved."  United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir.

1998).  "Where a commercial claim is not literally false but is misleading in

context, proof that the advertising actually conveyed the implied message and

thereby deceived a significant portion of the recipients becomes critical."  Id. at

1182 (citations omitted).

### ii.    False Statements

### aa.    Standard

MSP argues that Westech makes literally false statements in its internet

advertising.  "The court's assessment of literal falsity involves a two-stage inquiry:

(1) whether the challenged advertisement conveys an explicit factual message,

28

and (2) whether that explicit factual message is false." <u>Surdyk's Liquor, Inc. v.</u>

<u>MGM Liquor Stores, Inc.</u>, 83 F. Supp. 2d 1016, 1022 (D. Minn. 2000) (citations

omitted) ).

### bb.    Literally False Statements

MSP takes issue with past statements on Westech's advertising on the

internet as of April 18, 2007.

First, MSP claims that Westech's advertisements are false because Westech

uses "our new NGI" and the "Westech Next Generation Impactor (WNGI)" on its

website.  MSP argues that there is only one genuine NGI that has been approved

by the Consortium - MSP's NGI.  Because the Court has determined that it is likely

that the terms Next Generation and NGI are protected marks, it concludes that

MSP is also likely to succeed in showing that Westech's use of those marks to

identify its own product, as opposed to MSP's product, is false.

Second, MSP asserts that Westech conveys the false impression that the NGI

Consortium approved Westech's NGI by stating "The fifteen pharmaceutical

companies were involved with design and qualification of the new instrument

called the Next Generation Cascade Impactor (NGI)."  MSP argues that the

Consortium members were not involved in the design and qualification of the

Westech impactor; in fact, the Consortium no longer exists.

Westech asserts that it identifies the Consortium by name and accurately

describes its history and the reason for its formation.  It is true that the

Consortium was involved with the design and qualification of the new impactor

called the "Next Generation Cascade Impactor (NGI)."  However, the Court

concludes that MSP is likely to succeed in showing that this statement is false

because it is likely to show that the terms NGI and Next Generation Impactor are

MSP's protected marks and Westech's advertisement falsely states that the

Consortium was involved in developing and approving Westech's product.

     Third, MSP asserts that Westech's claim that its NGI is validated by the

Consortium is false.  Westech's website states, "As another validated instrument

for inhalation drug and devices testing, the NGI fulfills many needs in evaluations

with advanced features."  MSP argues that this statement is false because there

are no tests or documents to support Westech's claim.  See Pfizer, Inc. v. Y2K

Shipping & Trading, Inc., No. 00 CV 5304(SJ), 2004 WL 896952, at *8 (E.D.N.Y.

Mar. 26, 2004) (unpublished) (holding statements that product had clinically

proven efficacy were literally false when no tests or documents existed to support

claims).

     Westech responds that, in the pharmaceutical industry, a "valid" instrument

means that the measurements of the critical components' dimensions comply with

EP and USP specifications.  Westech claims that it validated its own NGI by

measuring the dimensions of its critical components and confirming that they fell

within the EP and USP specifications for NGIs, as originally approved by the Consortium. Thus, it claims, the statement is not literally false.

The Court concludes that MSP is likely to succeed in showing that this statement is literally false, because the evidence and multiple dictionary definitions shows that an instrument is validated when it has been approved or confirmed valid and there is no evidence that Westech's impactor has been approved by the Consortium or any other body or even tested by Westech itself. See, e.g., Webster's Third New Int'l Dictionary Unabridged (1993) (defining "validate" as "to corroborate or support on a sound basis or authority").

### cc.     Literally False by Implication

MSP also asserts that Westech has made statements that are literally false by necessary implication. A statement is literally false by implication if the intended audience would recognize the claim "as readily as if it had been explicitly stated." Millennium Import Co. v. Sidney Frank Importing Co., Inc., 72 U.S.P.Q.2d 1661, 1665 (D. Minn. 2004).

MSP states that Westech has partially altered the language on its website and in product brochures to make the misrepresentation of an endorsement by the Consortium less overt. However, it asserts that the continued juxtaposition of information about the Consortium with the description of the Westech impactor would cause even a sophisticated consumer to read the statements as necessarily

stating that the Westech impactor was developed in conjunction with, and approved by, the Consortium. MSP argues that this impression is amplified because Westech cites to the peer-reviewed article co-authored by one of NGI's founders that describes test results from MSP's NGI device. Further, Westech implies that its device was validated by research conducted by MSP on the original NGI device, before Westech's device existed.

The Court concludes that MSP is likely to succeed in showing that Westech's advertisement is literally false by necessary implication when, in MSP Exhibit 14, Westech recounts the flow rates based on a 2003 article testing the MSP NGI. Any reasonable reading of the advertisement as a whole would lead a consumer to think that Westech was stating that these reported flow rates were the flow rates for its own impactor based on tests of that impactor. In fact, Westech admits that the test results are for tests of the MSP impactor.

### iii.    Deception

Because MSP is likely to succeed in showing that the statements are literally false, then it does not need to offer evidence that anyone was actually deceived or misled by Westech's advertisements. As the Court has already analyzed, because the noted statements are, in fact, false, they have a tendency to mislead consumers.

### iv.     Materiality of Deception

Westech does not address the materiality factor.  The Court concludes that

MSP is likely to meet this factor because it has provided evidence that impactor

customers highly value the rigorous testing and approval process applied to the

NGI device, and Westech is attempting to usurp this advantage in its ads.

### v.     Interstate Commerce

Westech does not dispute the interstate commerce factor.  In any case, MSP

is likely to succeed in meeting this factor because Westech caused the false

statements to enter interstate commerce by posting the statements on the

internet.  Intermatic Inc. v. Toeppen, 947 F. Supp. 1227, 1239-40 (N.D. Ill. 1996).

### vi.     Injury

Westech does not address this factor.  MSP states that Westech is trading on

its reputation and good name by falsely marketing a direct competitor to the NGI

device, so MSP is likely to suffer injury.  Although there is little evidence

regarding this factor, at this stage, the Court concludes that MSP is likely to meet

this factor.

Overall, at this preliminary injunction stage, the Court concludes that MSP

is likely to succeed on its false advertising claims.

### 2.     State Law Claims

Both parties agree that MSP's claims under Minnesota common law and the

Minnesota Deceptive Trade Practices Act, § 325D.44, are coextensive with MSP's

Lanham Act claim, so no separate analysis is necessary.  See DeRosier v. 5931 Bus.

Trust, 870 F. Supp. 941, 948 n.8 (D. Minn. 1994).  Thus, the Court concludes that

MSP is likely to succeed on its state trademark claims based on the terms NGI and

Next Generation Impactor and on false advertising claims, but not on its state

trade dress claim or state trademark claims based on the color or shape of the

NGI.

### C.    Threat of Irreparable Harm

"Irreparable harm exists, as a matter of law, where there is trademark

infringement.  Thus, courts may presume irreparable harm when likelihood of

confusion is demonstrated in a trademark case.  Moreover, the loss of goodwill

toward a business is precisely the sort of irreparable harm that is properly

prevented through a preliminary injunction."  Advantus Capital Mgmt., Inc., 2006

WL 2916840, at *5 (citations omitted).  Because the Court concludes that MSP

has shown a likelihood of success on the merits on its trademark and false

advertising claims,  the Court presumes it has shown irreparable harm for those

claims.

### D.    Balance of the Harms

A defendant who has only recently marketed a competing product does not

weigh heavily in the balance of the harms.  Aveda, 706 F. Supp. at 1431.  Westech

has yet to manufacture or sell any NGI-like impactors.  On the other hand, MSP has advertised and sold its NGI for seven years.  MSP claims it has invested time, resources, and reputation to develop a product and should be protected from newcomers using shortcuts to capitalize on that hard work and good will.

Because MSP has invested far more time and resources into its product and branding than Westech has, this factor weighs in favor of granting the preliminary injunction.

### E.    Public Interest

The public interest supports issuing a preliminary injunction to protect consumers.  See, e.g., Am. Dairy Queen Corp. v. New Line Prods., Inc., 35 F. Supp.2d 727, 733 (D. Minn. 1998) ("Infringement and dilution of trademarks are inherently contrary to the public interest.") (citation omitted).

### F.    Bond

MSP asks that the Court set a nominal bond, but neither party explicitly addresses any reasonable calculation of a bond amount.  The Court sets the bond at $100,000 by balancing the fact that Westech has not invested heavily in its impactor at this point and has not yet produced any of these impactors for sale with the fact that Westech could earn hundreds of thousands of dollars in revenue from selling less than one hundred of these products.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.   Plaintiff MSP Corporation's Motion for Preliminary Injunction [Docket No. 6] is **GRANTED IN PART** and **DENIED IN PART** as follows: the motion is **GRANTED** as to MSP's NGI and Next Generation trademark and false advertising claims and **DENIED** as to MSP's trade dress and color and shape trademark claims.

2.   Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it who receive actual notice of the order, are preliminarily enjoined from:

   a.   making any false and misleading statements suggesting any collaboration with, or approval from, the Consortium, in connection with Westech's impactor, or any other statements regarding the Consortium, MSP, or the Westech impactor that are likely to cause confusion, cause mistake, or deceive consumers as to the affiliation, connection, and association of the Westech impactor, on or, in connection with, any pharmaceutical impactor or in any solicitation or in any other communication, letter, flyer, correspondence, e-mail, or envelope in connection with the advertisement, marketing, distribution, sale, or offer for sale of Defendants' pharmaceutical impactor products.  Examples of prohibited misleading statements are set forth in the body of this Preliminary Injunction.

   b.   from using the term "NGI," "next generation," or any other similar term likely to cause confusion therewith, including, but not limited to, Plaintiff's "NGI" and "Next Generation" marks, on or in connection with any pharmaceutical impactor or in any solicitation or in any other communication, letter, flyer, correspondence, e-mail, or envelope in connection with the advertisement, marketing, distribution, sale or offer for sale of Defendants' pharmaceutical impactor products, unless the terms are used to clearly describe MSP's product; and

      c.     from otherwise infringing Plaintiff's rights in the "NGI" and "Next Generation" marks in a way that is likely to cause confusion, mistake, or deception with the marks.

3.     Plaintiff MSP is ordered to post a bond in the amount of one hundred thousand dollars ($100,000).

4.     This Order shall be effective immediately.

Dated:  August 6, 2007                 s / Michael J. Davis
                                           Judge Michael J. Davis
                                           United States District Court